TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







BEFORE THE COURT EN BANC










NO. 03-97-00649-CV







Aer-Aerotron, Inc., Appellant



v.



Texas Department of Transportation, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT


NO. 97-07731, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING








 On its own motion the Court has submitted this cause for en banc consideration. 
Appellant Aer-Aerotron, Inc. sued appellee Texas Department of Transportation for breach of
contract. Asserting that Aerotron had not obtained legislative consent to sue, the Department
claimed immunity from suit and moved to dismiss for want of jurisdiction. The trial court
dismissed the cause solely on jurisdictional grounds. (1) We will reverse the order of dismissal and
remand the cause to the trial court.


FACTUAL BACKGROUND


 We determine the trial court's jurisdiction from the good-faith factual allegations
made by the plaintiff. See Brannon v. Pacific Employers Ins. Co., 224 S.W.2d 466, 469 (Tex.
1949); Flowers v. Lavaca County Appraisal Dist., 766 S.W.2d 825, 827 (Tex. App.--Corpus
Christi 1989, writ denied). Unless the defendant pleads and proves that such allegations were
fraudulently made to confer jurisdiction, they are accepted as true. See Flowers, 766 S.W.2d at
827; see also Firemen's Ins. Co. v. Board of Regents of the Univ. of Tex. Sys., 909 S.W.2d 540,
542 (Tex. App.--Austin 1995, writ denied). The Department has not asserted any fraudulent
pleading here. We take our recitation of facts from Aerotron's pleadings.

 In 1991, the Department sought to standardize the radios used in its districts
throughout the state. Aerotron made a bid to supply standard base-station radios and one model
of remote-control units for use in the field. On April 25, 1991, the Department accepted
Aerotron's bid and entered into a one-year contract for Aerotron to supply 75 base-station radios
at $5490 each and 50 remote-control radios at $1136 per unit, for a total of $468,550. The
contract required Aerotron to ship a sample of each radio to the Department, which then had up
to 30 days to test them for conformity to the contract specifications. On June 28, 1991, Aerotron
shipped the two samples. The Department tested them and asked for certain modifications, which
Aerotron made. On October 16, 1991, the Department "specifically and unequivocally" approved
the modified samples and authorized Aerotron to ship 40 of the base stations and 48 remote-control
units within 60 days.

 On December 9, the Department extended the term of the contract for one year; the
following day, it ordered 25 additional remote-control units. On January 3 and 6, 1992, Aerotron
shipped 88 radios and the Department accepted them. On February 7, the Department ordered
75 additional base stations and 50 more remote-control units; on April 23 it ordered 25 more 
remote units. In the first year of the contract, the Department increased its purchase order from
125 to 300 radios, raising the total contract price to $993,900.

 During the first part of 1992, the Department paid $396,804 for 127 radios it had
received. In May 1992, after the Department had accepted more radios, it began to complain that
some of the units failed to meet contract specifications. Aerotron addressed the problems and
received the Department's acknowledgment that at least three of its four complaints had been
corrected. On June 15, the Department ordered 50 additional base stations; on July 27, it ordered
25 more remote-control units. Aerotron asked the Department in August 1992 to pay invoices that
had fallen due in March. In response to this request for payment, the Department raised additional
complaints that the radios did not conform to specifications, despite its acceptance and request for
additional radios.

 On December 17, 1992, the Department demanded that Aerotron refund $396,804
for all radios that the Department had received and paid for, noting that it would return the radios
as soon as it could get them "back from the districts." Additionally, the Department canceled the
balance of its purchase order. (2) On December 24, Aerotron suggested that the Department had
breached its obligations under the contract by its failure to pay $225,258 for radios received and
accepted, and insisted that the Department fulfill its own contractual obligations by paying the
balance due. Nevertheless, Aerotron again offered to modify the radios it had delivered to satisfy
the Department. The Department subsequently authorized the modifications and in March 1993,
Aerotron began fixing the problems. In April 1993, the Department ordered 13 more remote-control radios. (3) The Department expressed its appreciation for Aerotron's willingness to make
corrections. Aerotron's technicians gave hands-on training throughout the state to Department
users of its radios. In June, Aerotron began to help install equipment in all districts and stationed
a technician in Texas to monitor the operation of the equipment. In July 1993, the Department
assured Aerotron that it would pay its outstanding bill by the end of its fiscal year, August 31. 
But in August, the Department said that it could not pay Aerotron out of its current budget and
would pay in early September.

 In a letter dated September 9, 1993, Aerotron's president Andrew Kostantinidis 
again requested payment, detailing the hardships that the Department's failure to pay had caused
the company, forcing it to file Chapter 11 bankruptcy. Kostantinidis noted that, to satisfy the
Department's complaints, the company had made nine separate modifications to the equipment,
none of which he believed were required by the specifications. "I believe there is no end to what
we are being asked to do to modify our radio equipment," wrote Kostantinidis. "The fact is that
the equipment met the specifications and was not only accepted by the department's radio group
but orders continued to flow to Aerotron. The purchase contract was both increased in quantities
and renewed by the department." Kostantinidis closed by saying that Aerotron "remains willing
to arrive at a suitable resolution to the department's requirements. Once your account becomes
current we are willing to continue with the program agreed on in June . . . ." The Department's
response came October 21, 1993; instead of sending payment, it announced it would return all
radios accepted but not paid for, (4) demanded that Aerotron fix all the radios it had paid for or
refund the entire $396,804, and canceled all pending orders. In the same letter, the Department
conceded that Aerotron had "incurred considerable cost in attempting to fix the radios" and that
the president of Aerotron, the technician, and the engineering staff had spent "countless hours"
working on the problem. The Department added that it shared Aerotron's "frustration" but
believed that Aerotron had been given sufficient time to fix the radios. Aerotron's suit for breach
of contract followed.


DISCUSSION


Breach of Contract

 It has long been recognized that sovereign immunity protects the State from lawsuits
for damages, absent legislative consent to sue the State. See, e.g., Federal Sign v. Texas S. Univ.,
951 S.W.2d 401, 405 (Tex. 1997). The term "sovereign immunity" actually includes two
principles: immunity from suit and immunity from liability. See id. Immunity from suit bars
legal action against the State, even if the State acknowledges liability for the asserted claim, unless
the legislature has given consent to sue. See id. Immunity from liability protects the State from
judgments even if the legislature has expressly given consent to sue. See id. When the State
enters into a contract with a private entity, it gives up its immunity from liability but not its
immunity from suit. See id.

 In Federal Sign, the plaintiff company signed a contract with Texas Southern
University ("TSU") to construct and deliver basketball scoreboards to TSU. Seven months later,
before the scoreboards were delivered, TSU indicated it had decided to secure the scoreboards
from another source. Federal Sign sued for breach of contract, asserting damages for lost profits
and expenses. The trial court overruled TSU's plea to the jurisdiction, submitted the case to a
jury, and rendered judgment on the jury verdict in favor of Federal Sign. On appeal, the supreme
court considered a narrow issue: whether the State waives its immunity from suit by contracting
with a private citizen. The majority held: "The act of contracting does not waive the State's
immunity from suit." Federal Sign, 951 S.W.2d at 408. The court went on to explain, however,
that its decision was limited to the particular facts presented:


We hasten to observe that neither this case nor the ones on which it relies should
be read too broadly. We do not attempt to decide this issue in any other
circumstances other than the one before us today. There may be other
circumstances where the State may waive its immunity by conduct other than
simply executing a contract so that it is not always immune from suit when it
contracts.



Id. at 408 n.1. Morever, four of the six justices constituting the majority also joined a concurring
opinion emphasizing that "the Court's opinion is limited, despite some occasional broad
language." Id. at 412 (Hecht, J., concurring).

 The broad language found in the majority's opinion states that "it is the
Legislature's sole province to waive or abrogate sovereign immunity." Id. at 409. Absent further
discussion, that would end the matter. But we cannot ignore the court's clear suggestion that there
may be circumstances where the State, by engaging in conduct involving more than signing a
contract, may waive its immunity from suit. The court on one hand appears to say that only the
legislature can waive or abrogate sovereign immunity, while on the other it indicates that state
entities may by their conduct waive immunity from suit in some circumstances. We are
constrained to harmonize the above language with the declaration of the majority and the
concurring opinions that Federal Sign was expressly intended to be a limited ruling. We do so by
focusing on the narrow issue that was before the supreme court: whether TSU's act of signing a
contract waived its immunity from suit.

 The Federal Sign majority held that it was up to the legislature to abrogate
immunity from suit when the State merely enters a contract. We read the court's opinion to mean
that only the legislature can generally pronounce that the mere act of signing a contract abrogates
the State's immunity from suit, but an entity of the State may waive its immunity with regard to
a particular contract if warranted by its conduct. Thus, our task is to confront the issue left
unresolved by the supreme court in Federal Sign: did the Department engage in conduct, beyond
the mere execution of the contract, that waived its immunity from suit?

 We have outlined the Department's conduct in detail, taking as true the facts alleged
in Aerotron's petition. See Firemen's Ins. Co., 909 S.W.2d at 542. Initially, the Department had
30 days to test the prototype of both radio units; it requested some modifications, which Aerotron
made. The Department then approved the modified samples and authorized Aerotron to
manufacture and ship 88 radio units. As further evidence of its approval of the product, the
Department accepted and paid for 127 radios, twice extended the contract term, and continued to
increase the number of units ordered. The Department first raised complaints about some of its
radios in May 1992. Aerotron apparently satisfied its concerns because the Department ordered
additional radios in June and again in July 1992. But in August 1992, when Aerotron asked the
Department to pay $225,258 owing for radios in its possession, the Department responded by
raising more complaints. Then in December 1992, more than a year and a half into the contract,
the Department demanded that Aerotron refund all monies received under the contract and told
Aerotron that it would return every radio. Aerotron again tried to work with the Department to
modify the equipment to meet the Department's needs. Aerotron apparently succeeded, because
the Department again ordered more radios in April 1993. In both July and August of that year,
the Department promised to pay its balance due to Aerotron. But in October, the Department
attempted to return all radios it had not paid for in lieu of paying its bill, demanded a full refund
of all monies paid under the contract, and again canceled all pending orders.

 The Department did more than sign this contract. Its actions over a period of two
and a half years fully implicated it in the performance of the contract: the Department approved
the radios after testing the samples; it twice extended the term of the contract; it more than trebled
the number of radio units ordered throughout the contract term; (5) it accepted Aerotron's technical
services; and it acknowledged its financial obligations by twice promising to pay the balance due
to Aerotron. Aerotron filled the ever-increasing orders, made more than nine modifications that
were not required under the contract specifications, helped the Department install equipment in
all districts, and stationed a technician in Texas to monitor the operation of its equipment for the
Department. On September 9, 1993, Aerotron's president asked the Department, "How, after all
the above, can the department state that the first and all other units as well did not meet the
specifications?" Outlining the economic damage that Aerotron had suffered due to the
Department's failure to pay for equipment it had received, Kostantinidis continued, "If in fact the
units did not meet the specifications it was the Department's obligation to reject them and at that
point there would be no further manufacturing nor would additional inventory of production parts
be purchased by Aerotron."

 If conduct can ever waive immunity from suit, as the supreme court suggested in
Federal Sign, we hold that under these circumstances the Department has waived its immunity
from suit and must now appear to answer Aerotron's breach of contract claims. We note that
since the supreme court handed down Federal Sign, two courts of appeals have identified
circumstances in which the State, by its conduct, has waived its immunity from suit for breach of
contract. See Texas S. Univ. v. Araserve Campus Dining Servs., Inc., 981 S.W.2d 929 (Tex.
App.--Houston [1st Dist.] 1998, pet. denied); Alamo Community College Dist. v. Obayashi Corp.,
980 S.W.2d 745 (Tex. App.--San Antonio 1998, pet. denied). We consider the circumstances
presented in this cause to more fully implicate the Department in the performance of its contract
than the conduct of the State in either of those cases. We sustain the points of error raised in
Aerotron's first and second issues, and therefore do not address Aerotron's third issue.

CONCLUSION

 Relying on the majority's instruction to read its holding in Federal Sign narrowly,
we distinguish this cause in which the Department has done much more than merely sign a
contract. Because that is all that the supreme court decided in Federal Sign, we accept the court's
invitation to consider factually distinct circumstances where the Department by its
conduct--accepting the radios, extending the term of the contract, increasing its orders, twice
promising to pay the balance due, requesting and receiving technical modifications and
assistance--has waived its immunity from suit for breach of contract. We therefore reverse the
trial court's judgment dismissing Aerotron's cause of action for want of jurisdiction and remand
the cause to that court for further proceedings.



 

 Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices Jones, Kidd, B. A. Smith, Yeakel and Powers*;

 Justice Patterson not participating

Reversed and Remanded

Filed: June 17, 1999

Publish





* Before John E. Powers, Senior Justice, (retired), Third Court of Appeals, sitting by
assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1. The Department also asked the court to dismiss because limitations had run. The trial court
specifically based its dismissal on the state's assertion of sovereign immunity.
2. This cancellation caused Aerotron to reply, "The source of the problem is not Aerotron, it
is that your budgetary restrictions prevented you from educating the users and maintainers of the
newly designed system." Letter from Ernest Schwabe, then president of Aerotron, dated
December 24, 1992. On February 2, 1993, the Department responded, "Lack of Aerotron
manuals, not budgetary restrictions, prevented us from training our users on Aerotron equipment."
3. Although not documented in the record, the dates reflect that the Department extended the
contract for a third year.
4. Aerotron's pleadings, which we must accept as true, claimed that $221,876 was due and
owing for radios that had been shipped to the Department earlier in 1992 on March 20, March 27,
April 3, May 1, July 2, August 26, and August 28. Aerotron asserted other damages that brought
the total balance due to $242,899.
5. The original contract provided for a total of 125 radios; after all the increases documented
in the pleadings, the Department had ordered a total of 383 radios.



>we hold that under these circumstances the Department has waived its immunity
from suit and must now appear to answer Aerotron's breach of contract claims. We note that
since the supreme court handed down Federal Sign, two courts of appeals have identified
circumstances in which the State, by its conduct, has waived its immunity from suit for breach of
contract. See Texas S. Univ. v. Araserve Campus Dining Servs., Inc., 981 S.W.2d 929 (Tex.
App.--Houston [1st Dist.] 1998, pet. denied); Alamo Community College Dist. v. Obayashi Corp.,
980 S.W.2d 745 (Tex. App.--San Antonio 1998, pet. denied). We consider the circumstances
presented in this cause to more fully implicate the Department in the performance of its contract
than the conduct of the State in either of those cases. We sustain the points of error raised in
Aerotron's first and second issues, and therefore do not address Aerotron's third issue.

CONCLUSION

 Relying on the majority's instruction to read its holding in Federal Sign narrowly,
we distinguish this cause in which the Department has done much more than merely sign a
contract. Because that is all that the supreme court decided in Fede